AO 106 (Rev. 04/10)  Application for a Search Warrant  (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   **2:17MJ-659** |
| Digital Devices Seized on March 8, 2017 | ) ) ) | |

**FILED**
CLERK, U.S. DISTRICT COURT

**MAR 2 7 2017**

CENTRAL DISTRICT OF CALIFORNIA
BY _____ mp

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____**Central**_____ District of _____**California**_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(A)(iii); 21 U.S.C. § 846 | Conspiracy to Possess, and Possession with Intent to Distribute, Methamphetamine |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Robert R. Thomas
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   3/27/2017

City and state:  Los Angeles, California

_____
*Judge's signature*

Alicia G. Rosenberg
_____
*Printed name and title*

AUSA: George E. Pence x 12253

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following digital devices (the "CELL PHONES"), seized on March 8, 2017, and currently maintained in the custody of the Drug Enforcement Administration in Los Angeles, California:

1.     Black iPhone with IMSI 310120224952022.

2.     Gold iPhone with IMSI 310120149462520.

3.     iPhone, Model A1661, with IMSI 310120220533006.

<u>ATTACHMENT B</u>

I.   <u>ITEMS TO BE SEIZED</u>

1.   Fruits, evidence, and instrumentalities relating to violations of Title 21, United State Code, Sections 841(a)(1) (Possession with Intent to Distribute a Controlled Substance) and 846 (Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance):

a.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers.

b.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls.

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications or other text or written communications sent to or received from any digital device.

d.   Data, records, documents, programs, applications or materials relating to the trafficking of controlled substances, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents

i          Instrumentality Protocol

noting price, quantities, and/or times when controlled substances were bought, sold, or otherwise distributed.

     e.   Audio recordings, pictures, video recordings or still captured images on phone memory cards, or other storage related to the trafficking of controlled substances or the collection, transfer or laundering of the proceeds of illegal activities.

     f.   Contents of any calendar or date book stored on the CELL PHONES.

     g.   Photographs or videos of individuals, controlled substances, documents or other records, places, and things relating to the purchase, sale, transportation, or distribution of controlled substances.

     h.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations.

     i.   Any CELL PHONE used to facilitate the above-listed violations (and forensic copies thereof).

     2.   With respect to CELL PHONE used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

     a.   Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence.

b.    Evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

c.    Evidence of the attachment of other devices.

d.    Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device.

e.    Evidence of the times the device was used.

f.    Passwords, encryption keys, and other access devices that may be necessary to access the device.

g.    Applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it.

h.    Records of or information about Internet Protocol addresses used by the device.

i.    Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

3.    In searching the CELL PHONES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any CELL PONE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each CELL PHONE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the CELL PONES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each CELL PHONE capable of containing any of the items to be seized to the search protocols to determine whether the CELL PHONE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

      ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      e.   If the search team, while searching a CELL PHONE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that CELL PHONE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      f.   If the search determines that a CELL PHONE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the CELL PHONE and delete or destroy all forensic copies thereof.

      g.   If the search determines that a CELL PHONE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      h.   If the search determines that the CELL PHONE is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain

forensic copies of the CELL PHONE but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

        i.   The government may retain a CELL PHONE itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the CELL PHONE is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the CELL PHONE (or while an application for such an order is pending).  Otherwise, the government must return the CELL PHONE.

        j.   After the completion of the search of the CELL PHONES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    4.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

<u>AFFIDAVIT</u>

I, Robert R. Thomas, being duly sworn, declare and state as follows:

<u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is submitted in support of the following:

a.    A criminal complaint and arrest warrants for Jose Luis Hilario-Hernandez ("HILARIO") and Ruben Barajas ("BARAJAS") for a violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine).

b.    An application for a warrant to search the cellular telephones that were found in the possession of HILARIO, BARAJAS, and Alejandra Plancarte-Garcia, as described in Attachment A (the "CELL PHONES"), which is incorporated by reference, for evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) and (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine), and Title 21, United States Code, Section 846 (Conspiracy to Possess with Intent to Distribute Methamphetamine), as described further in Attachment B. Attachment B is also incorporated by reference.

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and

warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### BACKGROUND OF SPECIAL AGENT ROBERT R. THOMAS

3.    I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, section 2510(7), who is empowered to conduct investigations of, and to make arrests for, drugs offenses enumerated in Title 18, United States Code section 2516.

4.    I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA"), and have been employed as such since November 2009.  I am currently assigned to the Los Angeles Field Division Southern California Drug Task Force, High Intensity Drug Trafficking Area ("SCDTF-HIDTA").  SCDTF-HIDTA is a task force comprised of agents and officers from federal, state, and local agencies, assigned to investigate large-scale drug trafficking.

5.    During the course of my employment with DEA, I have received several hundred hours of comprehensive, formal instruction on such topics as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of drug traffickers' telecommunications devices, criminal law, surveillance, and other investigative techniques.  I have assisted in investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of drugs

Instrumentality Protocol

and other controlled substances, and conspiracies associated
with drugs and controlled substance offenses. I have been
involved in drugs related arrests which resulted in the seizure
of drugs and other evidence.

6.    During my training and through the course of my
employment with DEA, I have used a variety of investigative
techniques and resources, including, but not limited to,
surveillance, confidential sources, undercover operations,
telephone toll analysis, installation, monitoring and retrieval
of trackers, and wire intercept communications analysis in Title
III and wiretap investigations.

7.    I am familiar with drug traffickers' methods of
operation, including the distribution, storage, and
transportation of drugs, and the collection of money which
represents the proceeds of drug trafficking and money
laundering.  I have also participated in investigations
involving the installation, use, and maintenance of electronic
tracking devices on cars.

## SUMMARY OF PROBABLE CAUSE

8.    On March 8, 2017, a Los Angeles County Sheriff's
Department ("LASD") deputy conducted a traffic stop of a gold
2001 Nissan Maxima traveling northbound on the Interstate 5
freeway ("I-5") for multiple violations of the California
Vehicle Code ("CVC").  At the time of the stop, the Nissan was
registered to and driven by HILARIO.  BARAJAS was a back seat
passenger in the car.  The car was also occupied by Alejandra
Plancarte-Garcia, who sat in the front passenger seat, and an

3        Instrumentality Protocol

infant female, who sat in the back seat.  During a consensual
search of the Nissan, the LASD deputy found and seized
approximately 18 pounds of methamphetamine from the trunk of the
car.  He also seized the CELL PHONES.

<u>STATEMENT OF PROBABLE CAUSE</u>

9.    The facts supporting this affidavit are based on my
knowledge, training, and experience, the collective experiences
related to me by other members of the SCDTF-HIDTA task force, my
conversations with LASD Deputy Michael Vann, and my review of
the incident report written by Deputy Vann.  I have also
reviewed supporting documents in this matter, including the
video recording of the traffic stop and the initial search of
the car.

**A.    Traffic Stop of HILARIO and BARAJAS**

10.    Based on my conversations with Deputy Vann, my review
of Deputy Vann's incident report, and my review of the video and
audio recordings of the traffic stop, I know the following:

a.    On March 8, 2017, at approximately 1:00 p.m.,
Deputy Vann was patrolling I-5 in the area of Smokey Bear Road
in Los Angeles County.  While Deputy Vann was monitoring
traffic, he saw a gold 2001 Nissan Maxima[1] traveling northbound
on I-5.  Deputy Vann saw the Nissan make an erratic lane change,
passing close to a black sedan, in violation of CVC 21703.
Deputy Vann then paced the Nissan and determined that it was

---

[1] The registration records for this car show a recent
transfer of ownership on February 9, 2017, to Jose Hilario
Hernamdez (sic) in Redwood City, California.

traveling at approximately 76 miles per hour, in violation of CVC 22349(a). Deputy Vann also saw the Nissan's passenger side tires come into contact with the white line between lanes three and four twice, in violation of CVC 21658(a). As Deputy Vann continued to follow the Nissan, he saw the car approach the rear of a tractor trailer and follow too closely, a second violation of CVC 21703. Deputy Vann then initiated a stop to warn and cite the driver of the Nissan for these violations. In response, the Nissan pulled to the right shoulder of I-5 and came to a stop.

b.    Deputy Vann approached the passenger side of the car and spoke to the driver, HILARIO, through the front passenger-side window. At this time, Deputy Vann saw Plancarte-Garcia in the front passenger seat, BARAJAS in the back seat behind the driver, and an infant in the rear passenger seat. Deputy Vann also immediately smelled the strong odor of both raw and burnt marijuana coming from inside the car. When asked for his driver's license, HILARIO said that he did not have it on him, but that he had a picture of it on his cellular telephone. At this time, to avoid talking over the front seat passenger, Plancarte-Garcia, Deputy Vann asked HILARIO to exit the car and speak with him in between the Nissan and the patrol car.

c.    While HILARIO was retrieving a picture of his driver's license from his phone, HILARIO said to Deputy Vann that they were traveling home to Madera, California, from Los Angeles. HILARIO said that they had been in Los Angeles for two days visiting family. Deputy Vann asked HILARIO how much

marijuana he had in the car and whether he had been smoking it with his infant child in the car. HILARIO replied that he only had two jars, never referring to an amount. During this conversation Deputy Vann saw that HILARIO's breathing become more labored as the conversation continued.

     d.   Deputy Vann then asked HILARIO if he was transporting anything illegal in the car, to which HILARIO replied, "No." When asked about the presence of firearms in the car, HILARIO replied, "No, no, no." Deputy Vann then asked specifically if there was any methamphetamine in the car, at which time Deputy Vann saw a change in HILARIO's demeanor. HILARIO took his hands out of his pockets and began waving them from side to side; he also began shaking his head from side to side to indicate that there was nothing illegal in the car. He also said, "No, nothing like that."

     e.   Deputy Vann then asked HILARIO if he could search the car. HILARIO initially replied, "Ummm, I'm trying to get on my way." Deputy Vann then explained to HILARIO his concern about the strong smell of marijuana and the presence of an infant, and that he wanted to make sure there was nothing illegal in the car. HILARIO replied, "Ya, okay." Deputy Vann then explained in detail his intent to search the car and asked HILARIO if he thought the search was fair, to which HILARIO replied "Ya, that's fair." HILARIO then said that he had "stuff" in the back seat, but made it clear that he had nothing in the trunk of the car. Deputy Vann then asked HILARIO to have a seat in the rear of the patrol car while Deputy Vann verified

HILARIO's driver's license status.  HILARIO agreed and sat in the rear of the patrol car.

f.   Deputy Vann then asked BARAJAS to exit the patrol car and speak with him.  BARAJAS said that they were heading home from Los Angeles where they had been "sight-seeing" for a few days.  Deputy Vann asked BARAJAS if he was transporting anything illegal in the car, to which BARAJAS responded, "No."  Deputy Vann asked BARAJAS if there were any firearms in the car, to which BARAJAS also responded, "No."  When Deputy Vann asked about the presence of methamphetamine, BARAJAS did not reply verbally.  Instead, he shook his head from side to side to indicate a negative response.  Deputy Vann asked BARAJAS if he would consent to a search of the car, to which he replied, "It's not my car."  When asked about the presence of his belongings in the car, BARAJAS said that all of his belongings were located in the back seat.  BARAJAS then complied with Deputy Vann's request for him to sit in the rear of his patrol car.

g.   Deputy Vann then spoke with the front seat passenger, Plancarte-Garcia.  She said that they were on their way home from vacation in Los Angeles.  When Deputy Vann asked if she had been in Los Angeles for a few hours or a week, Plancarte-Garcia replied "a week."  Deputy Vann asked if they had gone to Disneyland, and Plancarte-Garcia said that they had.  When Deputy Vann asked Plancarte-Garcia for her consent to search the Nissan she asked, "What did my husband say?"  When Deputy Vann asked what property in the car was hers, she said that her stuff was all in the back seat.  Deputy Vann had

Plancarte-Garcia remove the infant child from the car and stand to the side of the patrol car.

**B.    Search of the Nissan and Discovery of Methamphetamine**

11.    Based on my conversations with Deputy Vann, my review of Deputy Vann's incident report, and my own observation of the video and audio recordings of the traffic stop, I know the following regarding LASD's search of the Nissan:

a.    In order to safely conduct a search of the Nissan, Deputy Vann asked HILARIO and BARAJAS to exit the car and sit in the back of his patrol car for his and their safety. Deputy Vann then asked Plancarte-Garcia to exit the Nissan with the infant child and stand next to his patrol car.  Deputy Vann then searched the Nissan.

b.    Deputy Vann first searched the front of the passenger compartment.  Deputy Vann then opened the trunk and saw a large black trash bag on the left side of the trunk.  Upon opening the bag, Deputy Vann saw three packages, each a large plastic bag wrapped in foil and carbon paper, all containing a substance that he immediately recognized as methamphetamine. Upon finding and opening the trash bag, Deputy Vann saw Plancarte-Garcia begin to cry.

c.    In reviewing the video of HILARIO and BARAJAS during Deputy Vann's consensual search of the car, I heard and saw HILARIO and BARAJAS speaking.  After Deputy Vann located the black trash bag and found the three packages containing methamphetamine, HILARIO said to BARAJAS, "If they think that's mine . . . they are going to deport my ass."

d.    Deputy Vann then spoke with HILARIO again. Deputy Vann read HILARIO his Miranda rights.  HILARIO said that he understood those rights and agreed to speak without an attorney present.  HILARO said the methamphetamine did not belong to him and that he had no idea how it got in the trunk. When asked for additional details about where he was coming from, HILARIO added no such details.

e.    Deputy Vann then spoke with BARAJAS again. Deputy Vann read BARAJAS his Miranda rights.  BARAJAS said that he understood his rights and agreed to speak without an attorney present.  BARAJAS said that the methamphetamine belonged to him and that he was the one who put the bag in the trunk.  He said that he had purchased the "seven pounds" of methamphetamine from a house in Los Angeles for $100,000.  BARAJAS was unable to provide details on the location of the house.  BARAJAS said that he had called HILARIO for a ride home and had not told HILARIO what was in the bag.

f.    Deputy Vann removed the suspected methamphetamine from the Nissan and placed it into evidence bags.  A further search of the car uncovered no additional drugs.

g.    Deputy Vann also seized the following CELL PHONES:

i.    An Apple iPhone Model A1661, black in color, with phone number 650-274-9559 and IMSI 310120224952022, which was seized from and claimed by HILARIO ("CELL PHONE 1").

ii.    An Apple iPhone Model A1660, gold in color, with phone number 650-533-9788 and IMSI 310120149462520 which

was seized from the back seat of the car and was claimed by
BARAJAS ("CELL PHONE 2").

        iii. An Apple iPhone Model A1661 with phone
number 650-520-4475 and IMSI 310120220533006 which was seized
from the front passenger seat of the car and was claimed by
Alejandra Plancarte-Garcia ("CELL PHONE 3").

        h.   HILARIO and BARAJAS were subsequently placed
under arrest.

        i.   Deputy Vann transported HILARIO, BARAJAS, and the
drug evidence to the LASD Santa Clarita Station.  Law
enforcement also transported Plancarte-Garcia and the infant to
the LASD Santa Clarita Station, where they were released.

        j.   The Nissan was impounded and transported to
Wolf's Tow in Canyon Country, California.

        k.   On March 13, 2017, the DEA took custody of the
CELL PHONES and processed them into evidence.

        l.   On March 15, 2017, the DEA took custody of the
white crystalline substance seized during the March 8, 2017,
stop of HILARIO and BARAJAS and found that it had a gross weight
of 8.8 kilograms or approximately 18 pounds.  During processing,
a field test was conducted with a TruNarc analyzer which
returned a positive indication for methamphetamine.

## TRAINING AND EXPERIENCE REGARDING DRUG OFFENSES

12.  Based on my training, personal experience, and the
collective experiences related to me by other SCDTF-HIDTA task
force members who specialize in drug trafficking investigations,
I know the following:

a.   It is common for drug traffickers to use cellular telephones to communicate with co-conspirators or drug customers to arrange drug transactions with their drug trafficking associates.  These communications often include telephone calls, text, instant, and social media messages, and e-mail communications between the trafficker and the co-conspirators and customers, as well as Global Positioning System ("GPS") information, other locational information, and identifying information about the drug trafficker and his or her co-conspirators and customers.

b.   Drug traffickers often maintain books, records, receipts, notes, ledgers, bank records, and other electronic records relating to the cultivation/manufacture, transportation, ordering, sale and distribution of illegal controlled substances.  These individuals commonly "front" (provide illegal controlled substances on consignment) illegal controlled substances to their clients and, thus, keep some type of records or communication concerning monies owed.  The aforementioned books, records, communications, receipts, notes, ledgers, etc., are often maintained where the drug trafficker has ready access to them, such as on his or her cellular telephone.

c.   Data, records, documents, photographs, materials, programs, or other items contained on cellular telephones used by drug traffickers often contain, among other things, information relating to the purchase, sale, transport, or distribution of drugs, the location of previous drug transactions or location of where drugs may be stored, and/or

the identity or whereabouts of co-conspirators and drug customers involved in drug trafficking.

     d.   Drug traffickers often store data, records, documents, or materials consisting of contact lists that reflect the addresses, and/or telephone numbers of their associates in the drug trafficking organization and drug customers in their cellular telephones.

     e.   Drug traffickers commonly use their cellular telephones to take photographs and/or videos of themselves with drugs, drug paraphernalia, or the proceeds from their drug trafficking activities.

### TRAINING AND EXPERIENCE REGARDING DIGITAL DEVICES

13. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

     a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before

they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

        e.    Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was

                                    14       Instrumentality Protocol

once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data

on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

       g.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

Case 2:17-mj-00659-DUTY   Document 1   Filed 03/27/17   Page 25 of 25   Page ID #:76


14.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## CONCLUSION

15.   For all the reasons described above, there is probable cause to believe that HILARIO and BARAJAS violated Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine).

16.   Further, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a) (Possession with Intent to Distribute a Controlled Substance) and 846 (Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance) will be found on the CELL PHONES.

_____
Robert R Thomas
Special Agent
Drug Enforcement Administration

Subscribed to and sworn before me this 27th day of March 2017.

_____
UNITED STATES MAGISTRATE JUDGE